UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:21CR263 MTS (SPM) |
| ) | |
| MICHAEL FABIAN MORALES, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION AND**
**MEMORANDUM OPINION OF UNITED STATES MAGISTRATE JUDGE**

All pretrial matters in the above-referenced case have been referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). Currently before the Court is Defendant Michael Fabian Morales's Motion to Suppress Evidence. Doc. 73. Morales seeks an order suppressing all evidence retrieved by agents of the Federal Bureau of Investigation (FBI) from an iPhone seized from his residence on February 18, 2021, pursuant to a federal search warrant. Morales contends the evidence was illegally obtained in violation of the Fifth Amendment because investigators compelled him to manually enter a passcode into the iPhone after he refused to make any statements without a lawyer present. The United States disputes agents violated the Fifth Amendment and argues that, even assuming a violation occurred, suppression is inappropriate under the inevitable discovery and foregone conclusion doctrines.

For the reasons set out below, I find that suppression is inappropriate in this case, and recommend that Morales's motion to suppress be denied.

## BACKGROUND AND PROCEDURAL HISTORY

Defendant Michael Fabian Morales is charged by Indictment with one count of Receipt of Child Pornography and one count of Possession of Child Pornography. Morales was arrested on April 30, 2021, and appeared for an initial appearance and arraignment on the same date. At the arraignment, counsel for Morales made an oral motion for time to review discovery and determine whether to file pretrial motions. *See* Doc. 13. The undersigned entered a scheduling order setting a pretrial motion deadline of July 6, 2021. *See* Doc. 20. However, Morales subsequently requested, and was granted, additional extensions of the pretrial motion deadline through November 8, 2021. On November 8, 2021, Morales filed a Motion to Suppress Evidence. *See* Doc. 46.

Before the United States could respond to Morales's suppression motion, Morales filed a motion to withdraw the Motion to Suppress because the parties had negotiated a plea agreement. *See* Doc. 50. On December 15, 2021, following a hearing, the undersigned entered an order granting Morales's motion to withdraw the previously filed pretrial motion and notifying the parties that the case was ready to be set for trial by U.S. District Judge Matthew Schelp. *See* Doc. 55.

On February 2, 2022, Morales filed a motion to re-refer the case to the undersigned for pretrial proceedings because the Court rejected the plea agreement, and the parties were unable to agree on new terms that would satisfy the defendant and address the Court's concerns. *See* Doc. 66. That motion was granted by Judge Schelp and the matter

was re-referred to the undersigned on February 3, 2022. *See* Doc. 67. On February 15, 2022, the parties appeared before the undersigned for a scheduling conference and advised that Morales intended to re-file his previously withdrawn Motion to Suppress Evidence. The undersigned set a briefing schedule and set an evidentiary hearing on April 19, 2022. *See* Doc. 75.

On April 19, 2022, the parties appeared for the scheduled evidentiary hearing during which the United States presented testimony of FBI Special Agents David Rapp and Daniel Root. The United States also introduced into evidence a search warrant for a KIK account (Govt. Ex. 1); a search warrant for Morales's residence (Govt. Ex. 2); and photographs of Morales' home and the seized cell phone (Govt. Exs 4A-4D). Morales presented no witness testimony but cross examined the agents. At the close of the evidentiary hearing, the parties made oral arguments and the United States requested, and was granted, time to file a supplemental memorandum with additional case law in support of the United States' position. Briefing by both parties was completed on April 28, 2022, with the filing of Morales's Response in Opposition, and the matter is now fully briefed and ready for a ruling. *See* Docs. 76, 77, 81 & 84.

The undersigned has carefully considered all evidence offered and admitted at the evidentiary hearing. The undersigned has also considered the credibility of the witnesses and the arguments of the parties both at the hearing and in their written submissions. Based upon the evidence adduced at the hearing and the written submissions of the parties, the undersigned makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

Special Agent, David Rapp, is a twenty-one-year veteran of the Federal Bureau of Investigations ("FBI") who has spent the last four years in the FBI's Violent Crimes Against Children Task Force. In December 2020, the FBI office in Knoxville, Tennessee referred a case to Agent Rapp after an undercover FBI employee in Knoxville came across child pornography being traded and commented on by a user, mm6899, on a social messaging app known as KIK. The FBI Knoxville office investigated the KIK username associated with the child pornography and identified Michael Morales of Manchester, Missouri as a person associated with the KIK account under investigation. Because the potential subject was in the St. Louis area, the investigation was referred to Agent Rapp in the FBI office St. Louis.

After receiving the referral, Agent Rapp and other agents investigated further and determined that vehicles and/or driver's license information associated with the address provided by the Knoxville office came back to Michael Morales and Adrienne Morales. Agent Rapp confirmed, through physical surveillance, that vehicles parked at the address also were associated with Michael and Adrienne Morales. Armed with the foregoing information, on February 18, 2021, Agent Rapp applied for a search warrant for both the KIK account and the Morales residence in Manchester, Missouri.

### A. THE SEARCH WARRANT FOR MORALES'S RESIDENCE

On February 18, 2021, United States Magistrate Judge Noelle Collins issued a search warrant ordering the search of Morales's residence at 3429 Charleston Place,

Manchester, Missouri 63088 (the "Residence"). Govt. Ex. 2.  The warrant expressly authorized agents to seize "any mechanism used for the distribution, receipt or storage of [visual depictions, including still images, videos, films or other recordings of child pornography]" including cell phones. *Id.* Attachment B, ¶1. The warrant also expressly authorized agents to seize "all computer passwords and other data security devices designed to restrict access" and to obtain from Morales "the display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) necessary to unlock any Devices requiring such biometric access." *Id.* at ¶¶2 & 7.

The warrant was supported by an affidavit signed and attested to by Agent Rapp. Agent Rapp attested that the information in the affidavit came from his personal observations, training, and experience and from information obtained from other agents and witnesses. Agent Rapp also attested that, on December 20, 2020, a Knoxville FBI On-line Covert Employee ("OCE") was added to a public Kik group entitled Dungeon of Depravity. The OCE observed that this group was dedicated to openly trading child pornography of mainly juvenile females ranging in age from approximately 4 to middle teenage years. Between December 20-23, 2020, the OCE observed multiple members distribute child pornography into the room for all members to see and comment on.

Agent Rapp further attested that between December 20-23, 2020, one member of the group, described as MM (mm6899), posted multiple images and videos that constituted child pornography. The OCE captured screen records of these transactions and the Knoxville office issued a subpoena to Kik for information pertaining to username

mm6899. A subpoena return revealed that the account was registered in December 2019 using the email miguel6899@gmail.com via an iPhone. The subpoena return also revealed an AT&T U-verse IP address that was used by the user on the dates and time that the user shared child pornography. As such, the Knoxville office subpoenaed information from AT&T related to the IP address obtained agents obtained from Kik.

Agent Rapp attested that the subpoena return from AT&T revealed that the subscriber for the IP Address associated with child pornography shared via the Kik account was Michael Morales, email Miguel6899@gmail.com, with an address of 3429 Charleston Place, Manchester, Missouri. The Affidavit details the efforts of Agent Rapp (and perhaps others in the St. Louis office) to confirm Morales's address and telephone number.

### B. EXECUTION OF THE SEARCH WARRANT

On February 26, 2021, beginning at approximately 6:15 a.m., Agent Rapp and other agents began execution of the search warrant. When the agents arrived at Morales's residence, Morales came out before the agents reached the front door. They advised Morales that they were there pursuant to a search warrant and that Morales was not under arrest but was being detained for their safety (and his safety) until the house was secured. Agent Rapp then briefly detained Morales (in handcuffs) and his wife outside of the home while agents cleared the house. Once the house was cleared, Agent Rapp removed the handcuffs from Morales and advised him that they were conducting a federal search warrant and that if he wanted to talk Agent Rapp could give him more information about

the search warrant.

At that point, before Agent Rapp had an opportunity to advise Morales of his *Miranda* rights, Morales said he would prefer to have a lawyer with him. Agent Rapp advised that was his right under *Miranda* and indicated he would not question him anymore. Agent Rapp then advised Morales that he was free to go but that Morales could stay, if he preferred, while they conducted the search. Morales said he preferred to stay. Agent Rapp told him that was fine, but he would not be free to move around the house until the agents completed their search. Morales agreed and went back into the house with his wife and sat on the couch in the living room as the agents conducted the search. All told, over a dozen agents and other officers conducted the search.

One of the agents who participated in the search was Special Agent Daniel Root, who is specially trained as a digital evidence extraction technician. At the time of the search of Morales's home, Agent Root had participated in well over one hundred residential searches for electronic devices that contain child pornography. Agent Root came to the search equipped with a laptop loaded with software approved by the FBI for digital analysis of phones as well as other digital tools. It is standard practice for agents like Agent Root to use their digital tools during a search to clear any devices on scene to ensure they are free of child pornography. Devices that have been cleared on-scene can remain with their owners. Devices that are not cleared on the scene are seized and taken by the agents for later forensic analysis.

During the search of the Morales residence, officers located two cell phones and a

laptop. Mrs. Morales told the officers that one of the cell phones and the laptop belonged to her but the other cell phone, marked at the hearing as Govt. Ex. 3, belonged to Mr. Morales. Agent Root explained to Mr. and Mrs. Morales that his job was to clear the devices and if they wanted him to clear the devices and there was no child pornography on them, he could leave the devices at the residence. Otherwise, Agent Root explained, the agents would need to take the devices with them. Agent Root handed the iPhone to Mr. Morales after making clear that, if Morales wanted his device cleared on scene, he would need to give Agent Root access to the device. Mr. Morales then entered the passcode and gave the phone back to Agent Root. Agent Root performed an advanced logical extraction of the iPhone and observed images and videos of child pornography on the phone. Thereafter, the iPhone was seized and packaged as evidence.

Agent Root credibly testified that, at the time he explained his process and handed the iPhone to Morales so that Morales could give him access to the phone, Agent Root was not aware that Morales had invoked his right to an attorney. Agent Root also testified, credibly, that he probably would not have asked Morales to enter the passcode had he known Morales had invoked his right to an attorney.

On February 4, 2022, at the request of AUSA Colleen Lang, Agent Root successfully unlocked Morales's seized iPhone without using the passcode provided by Morales during the search. In so doing, Agent Root used an FBI forensic tool that was available to him at the time of the search in February 2021.  Agent Root was able to extract and observe images and video of child pornography on the iPhone just as he did on

February 26, 2021. Based on that exercise and his training and experience, Agent Root opined that had Morales declined to unlock the phone by entering his passcode on February 26, 2021, Agent Root would have nevertheless been able to successfully unlock the phone and perform an extraction using the FBI forensic tool.[1]

## CONCLUSIONS OF LAW

Under the exclusionary rule, evidence obtained in violation of the Constitution may not be introduced at trial to support a defendant's guilt. *See Elkins v. United States,* 364 U.S. 206, 223-24 (1960) (evidence obtained in violation of the Fourth Amendment cannot be used against defendant in federal court); *Bram v. United States,* 168 U.S. 532, 548 (1897) (evidence obtained in violation of the Fifth Amendment cannot be used against defendant at trial). The purpose of the exclusionary rule is to deter constitutional violations, s*ee United States v. Leon,* 468 U.S. 897, 906 (1984), and it applies to verbal statements obtained because of official misconduct as well as to the more traditional seizure of physical evidence. *United States v. Yousif,* 308 F.3d 820, 832 (8th Cir. 2002).

In this case, Morales contends Agent Root violated his rights under the Fifth Amendment by compelling him to enter the passcode to his iPhone thereby giving the agent access to child pornography on the device. Morales asserts that because the passcode was compelled, testimonial, and self-incriminating, all evidence obtained from it should be suppressed as the "fruit of the poisonous tree." *See* Doc. 73, at p. 3-8. In response, the

---

[1] Agent Root credibly testified that there was some risk that a "brute force" opening of the phone could result in some loss of data but opined, generally, that he would have recovered the same or nearly the same data recovered by using the passcode provided by Morales.

United States contends Morales's motion should be denied because there was no Fifth Amendment violation and, even if there was a violation, the exclusionary rule does not apply pursuant to the inevitable discovery exception to the exclusionary rule. *See* Docs. 76 & 81.[2]

The Fifth Amendment protects an individual from being "compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. In *Miranda v. Arizona*, 384 U.S. 436, 448-450, 455 (1966), the Supreme Court recognized that custodial interrogations have the potential to undermine the privilege conferred by the Fifth Amendment against self-incrimination by possibly exposing a suspect to physical or psychological coercion. To guard against such coercion, the Court established a prophylactic procedural mechanism that requires a suspect to receive a warning before any custodial interrogation begins. *Id.* at 444. The protections set forth by the Supreme Court in *Miranda* are triggered only when a defendant is both in custody and being interrogated. *United States v. Hatten*, 68 F.3d 257, 261 (8th Cir. 1995).

### A.   MORALES WAS NOT IN CUSTODY FOR PURPOSES OF *MIRANDA*

The United States argues Morales was not in custody when he provided his passcode to Agent Root. As the factual findings demonstrate, Morales was in his home at the time he provided the passcode to Agent Root. Together with his wife, he was confined to his living room while agents executed a valid search warrant. Officers executing a valid

---

[2] The United States initially argued that, in addition to the inevitable discovery exception, the foregone conclusion exception also applies. However, it appears the United States abandoned this argument following the evidentiary hearing. *See* Docs. 76 & 81. As such, this Report and Recommendation does not address the question of whether the foregone conclusion doctrine applies.

search warrant are authorized to temporarily detain individuals found on the premises. *See Michigan v. Summers,* 452 U.S. 692, 704 (1981); *United States v. Cowan,* 674 F.3d 947, 952 (8th Cir. 2012). A person who is temporarily detained is not necessarily "in custody" for purposes of *Miranda* unless, under the totality of the circumstances at the time of questioning, "a reasonable person in [defendant's] position would [not feel] at liberty to end the interrogation and leave." *United States v. Brave Heart,* 397 F.3d 1035, 1038-39 (8th Cir. 2005). The Eighth Circuit has held that "[t]he ultimate question in determining whether a person is in custody for purposes of *Miranda* is whether, [from the perspective of the suspect], there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *United States v. Giboney,* 863 F.3d 1022, 1027 (8th Cir. 2017) *(quoting United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004)).

In *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990), the Eighth Circuit identified six factors that should inform the court's analysis in determining whether someone is in custody for the purposes of *Miranda*. The first three factors, described as "mitigating" factors, if present tend to show that a defendant was ***not in*** custody:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave . . ., or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; [and] (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions.

*Griffin*, 922 F.2d at 1349.

The remaining three factors, described as "coercive" or "aggravating", if present, favor a finding that the defendant was in custody during the interrogation: "(4) whether

strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; [and] (6) whether the suspect was placed under arrest at the termination of the questioning." *Id.* These factors are non-exhaustive and are not meant to be mechanically and rigidly applied. *Id.*

Applying the *Griffin* factors to the evidence in this case, the first factor is present and weighs heavily against a finding that Morales was in custody. Before starting the search, Agent Rapp told Morales he was not under arrest, but he would be detained for the safety of the agents and for Morales's safety until the house was secured. Agent Rapp then handcuffed Morales and briefly detained Morales and his wife outside of the home while agents cleared the house. Once the house was cleared, Agent Rapp removed the handcuffs and gave Morales the choice to stay or leave while the search was conducted. Morales said he preferred to stay. Agent Rapp told him that was fine, but he would not be free to move around the house until the agents completed their search. Morales agreed and went back into the house with his wife and sat on the couch in the living room as the agents conducted the search.

The second factor is partially present because, although Agent Rapp told Morales he would not be free to move around the house until the agents completed their search, Morales was neither physically restrained nor isolated. Instead, he was seated on the couch in the living room next to his wife. In addition, Agent Rapp made clear that this limitation on Morales's ability to move about was temporary and would last no longer than the execution of the search warrant. Based on the totality of the circumstances, a reasonable person would

not feel restrained to the degree associated with a formal arrest. *See, e.g., Giboney*, 863 F.3d at 1028 (defendant's freedom of movement not restrained where detective escorted defendant as he moved about the house during execution of a search warrant).

The answer to whether the third *Griffin* factor is present is also mixed. On one hand, Morales did not initially voluntarily acquiesce to questions because when Agent Rapp asked Morales if he wanted to talk about the warrant, he invoked his right to have an attorney present. Later during the search, Agent Root, unaware that Morales and previously invoked his right to counsel, explained that, if Morales and his wife gave him access to their devices, he could clear the device by performing a digital analysis on-scene and, assuming it was free of child pornography, he would leave the device at the house. Agent Root also explained that devices not cleared on the scene would be taken to the FBI lab for later forensic analysis. Thereafter, Agent Root handed Morales the phone his wife had identified as belonging to him, and Morales entered the passcode. Based on the totality of the circumstances, including Morales's earlier demonstrated understanding of his right to decline the agents' requests, Morales voluntarily acquiesced to Agent Root's request for the passcode.

As for the aggravating or coercive *Griffin* factors, only one is present—specifically, the atmosphere was police-dominated as there were more than a dozen agents and officers involved in the search. However, as the Eighth Circuit has held, "where a suspect is questioned in the familiar surroundings of his home and informed several times of his right to terminate the interview at will, . . . strong evidence of restraint on freedom of movement

of the degree associated with a formal arrest is necessary to overcome the natural inference that such questioning is non-custodial." *Giboney,* 863 F.3d at 1029.

The remaining aggravating or coercive *Griffin* factors are not present. There is no evidence that any officer used strong arm tactics or deceptive stratagems. And, although Morales's cell phone was seized after he provided his passcode to Agent Root, Morales himself was not arrested.

Based on the totality of the circumstances, I find that the circumstances here do not rise to the level of either a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Giboney,* 863 F.3d at 1027. At the time of the alleged Fifth Amendment violation Morales was in a police-dominated environment but that environment was his home. Perhaps more importantly, he was in his home by choice after having been given the option of leaving during the search. Morales's movement around his home was limited, but he was told it would be temporary and he was not otherwise physically restrained. Agent Root made no threats or promises and did not engage in strong-arm tactics or stratagems to get Morales's passcode. Instead, Morales provided the passcode after having previously demonstrated his understanding that he had a right to refuse the agents' requests. Morales may have been temporarily detained when he entered his passcode into his phone, but he was not in custody for purposes of *Miranda.* As such, Morales was not entitled to the full panoply of protections afforded under *Miranda. See Berkmer v. McCarty*, 468 U.S. 420, 440 (1980).

### B. MORALES'S PASSCODE WAS NOT COMPELLED

Morales argues the passcode was compelled, and cites *United States v. Sanchez*, 334 F. Supp.3d 1284 (N.D. Ga. 2018) in support. *See* Doc. 73, at p. 4. *Sanchez* does not support Morales's position. The defendant in *Sanchez* was a parolee whose parole officer suspected him of engaging in criminal activity while under supervision. *Id.* at 1290-91. During a parole search of the defendant's vehicle, the parole officer discovered multiple cell phones including two phones that required a passcode to open. *Id.* The defendant was present in the car and the parole officer asked defendant for the passcode, but he refused. *Id.* at 1291. After the defendant refused a second time, the parole officer warned the defendant that failure to follow his parole officer's instructions could result in his arrest for a violation of parole. *Id.* The defendant continued to refuse to provide the passcode and was eventually handcuffed by the officer who then applied for a parole warrant. *Id.* The parole officer advised the defendant a parole warrant had been issued but never advised the defendant of his *Miranda* rights. *Id.* at 1292. After the parole warrant was issued, the defendant gave his parole officer the passcode. *Id.* at 1292. The parole officer opened the phone and found evidence of drug trafficking.

The *Sanchez* court recognized that, though sparse, "case law indicates that production of cellphone passwords constitutes incriminatory testimony protected by the Fifth Amendment." *Id.* at 1295. The court concluded that, based on the circumstances in *Sanchez,* the defendant's password was compelled. *Id.* at 1297. The court reasoned the password was compelled; not because the parole officer asked for it, but because the parole officer "did

more than strongly imply that [d]efendant's parole would be revoked if he did not provide the passcodes. He warned [the defendant] that failure to follow instructions from a parole officer could result in his arrest for violation of parole, he obtained a parole violation warrant based on [the defendant's] refusal to provide the passcodes, and he arrested [the defendant] pursuant to that warrant." *Id.*

None of the strong-arm tactics detailed in *Sanchez* are present in this case. As set out in the preceding section, there is no evidence that either of the two agents Morales interacted with made any attempt to ***compel*** Morales to do anything. Agent Rapp made it clear to Morales at the outset that he was not under arrest and did not have to remain at his home during the execution of the search warrant. In addition, when Morales made it clear he did not want to speak with Agent Rapp without an attorney, Agent Rapp told him that was his right and did not question him further. Agent Root requested the passcode for Morales's cell phone but did so only after explaining that his role was to confirm the absence of child pornography on devices found at the scene so that, if cleared, he could leave the device(s) with their respective owners. Agent Root told Mr. and Mrs. Morales that ***if*** they wanted to have their phones cleared, he would need the passcode—a statement that impliedly permitted them to decide to simply allow the agents to seize the devices.

In sum, based on the facts of this case, Morales did not involuntarily provide the passcode. "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *United States v. Boslau,* 632 F.3d 422, 428

(8th Cir. 2011) (quoting *United States v. LeBrun,* 363 F.3d 715, 724 (8th Cir. 2004)). This determination must be made by looking at the totality of the circumstances, including both "the conduct of the officers and the characteristics of the accused." *LeBrun*, 363 F.3d at 724. Factors include, among other things, "the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." *Boslau*, 632 F.3d at 428 (quoting *Sheets v. Butera,* 389 F.3d 772, 779 (8th Cir. 2004)). Morales's motion to suppress fails because, for the reasons set out above, the United States established, by a preponderance of the evidence, that Morales's passcode was not "extracted by threats, violence, or express or implied promises sufficient to overbear Morales's will and critically impair his capacity for self-determination." *Boslau,* 632 F.3d at 428.

    C.    THE INEVITABLE DISCOVERY EXCEPTION APPLIES

Even if there was a Fifth Amendment violation, a finding not supported by the evidence, the exclusionary rule would not apply because this case falls within the inevitable discovery exception to the exclusionary rule. The inevitable discovery exception is a derivative of the independent source doctrine. *See Murray v. United States,* 487 U.S. 533, 539 (1988) (holding inevitable discovery rule is an extrapolation from the independent source doctrine because tainted evidence would be admissible if discovered through independent source, it should be admissible if it would have inevitably been discovered). Under the inevitable discovery exception, a court may admit illegally obtained evidence if the evidence would have inevitably been discovered through independent, lawful means.

For example, in *Nix v. Williams,* 467 U.S. 431, 448-50 (1984), the Supreme Court held that, because police would have inevitably discovered a murder victim's body via a comprehensive search that was already under way, evidence concerning the location of a murder victim's body was admissible even though the police obtained this information in violation of the defendant's Sixth Amendment right to counsel.

For this exception to the exclusionary rule to apply, the government must establish by a preponderance of the evidence that there is (1) a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) there was an active pursuit of a substantial, alternative line of investigation at the time of the constitutional violation." *United States v. Allen*, 713 F.3d 382, 387 (8th Cir. 2013). Both factors are met here.

Based on the factual findings, agents came to Morales's house armed with a search warrant that expressly authorized agents to seize "all computer passwords and other data security devices designed to restrict access" and to obtain from Morales "the display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) necessary to unlock any Devices requiring such biometric access." Govt. Ex. 2 at ¶¶2 & 7. Although Agent Root offered to clear devices found by agents during the search by conducting an on-site forensic analysis, he was both prepared and capable of performing a forensic analysis on any seized devices back at the FBI lab. As such, there was an active pursuit of a substantial, alternative line of investigation at the time of the alleged constitutional violation.

In addition, at the hearing Agent Root opined that had Morales declined to unlock the phone by entering his passcode on February 26, 2021, Agent Root would have nevertheless been able to successfully unlock the phone and perform an extraction using the FBI forensic tool. Agent Root's opinion was far from speculative. Agent Root credibly testified about his extensive training and experience as an FBI Special Agent extracting evidence from cell phones including the model owned by Morales. On February 4, 2022, at the request of AUSA Colleen Lang, Agent Root successfully unlocked Morales's seized iPhone without using the passcode provided by Morales during the search. In so doing, Agent Root used an FBI forensic tool that was available to him at the time of the search in February 2021.  Agent Root was able to extract and observe images and video of child pornography on the iPhone just as he did on February 26, 2021.

For the foregoing reasons, Morales's motion to suppress should be denied because the agents' discovery of child pornography on Morales's cell phone was inevitable absent the alleged Fifth Amendment violation.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence and Statements (Doc. 73) be **DENIED.**

The parties are advised that they have fourteen (14) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained. Failure to timely file objections may result in

a waiver of the right to appeal questions of fact. *See Thompson v. Nix,* 897 F.2d 356 (8th Cir. 1990).

Trial in this case will be conducted before the **Honorable Matthew T. Schelp**. Judge Schelp will schedule the trial by separate order.

Dated: June 10, 2022.

*/s/ Shirley Padmore Mensah*
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE